

U.S. Department of Justice

United States Attorney
Eastern District of New York

WK:AS
F. #2023V04164

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 19, 2024

By ECF

The Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

   Re: United States v. Walter Johnson
      Criminal Docket No. 96-932 (FB)

Dear Judge Block:

  The government respectfully submits this letter in opposition to defendant Walter Johnson's motion for a sentence reduction under Title 18, United States Code, Section 3582(c)(1)(A), as modified by the First Step Act of 2018 ("First Step Act" or "FSA"). The defendant is serving five concurrent life sentences for Hobbs Act robbery conspiracy, attempted Hobbs Act robbery, narcotics trafficking conspiracy, attempted possession of narcotics with intent to distribute, and witness tampering. At trial, a jury heard testimony from among others, Crystal Winslow ("Winslow"), whom the defendant robbed multiple times, raped, and sodomized with a foreign object. Based on the overwhelming evidence of his guilt, the jury convicted the defendant on December 8, 1997. Pursuant to 18 U.S.C. § 3559(c) (the "Armed Career Criminal Act"), mandatory life sentences attached to three of Johnson's convictions due to his prior state convictions for second degree robbery, first degree robbery, and attempted first degree robbery. Nothing about the defendant's current circumstances or time in prison support a sentence reduction given the heinous nature of these crimes. For the reasons stated below, this Court should deny the motion.

I. Background

  A. Offense Conduct

  On October 24, 1996, a grand jury sitting in the Eastern District of New York indicted the defendant for attempted Hobbs Act robbery, Hobbs Act robbery conspiracy, narcotics trafficking, using and carrying firearms during crimes of violence and drug trafficking crimes, and witness tampering. See Indictment, ECF No. 3. The charges arose from a series of

violent robberies that the defendant and various coconspirators committed between March 15, 1995 and February 5, 1996.

The primary victim of these robberies was Crystal Winslow. PSR ¶¶ 3-4. On March 15, 1995, the defendant and two coconspirators, armed with semi-automatic handguns, forced their way into Winslow's and her boyfriend Jay Tee Spurgeon's ("Spurgeon") apartment in Brooklyn, which the defendant had targeted because Spurgeon was a cocaine trafficker rumored to have stolen 30 kilograms of cocaine. PSR ¶¶ 4-5. The defendant and his coconspirators bound Winslow and Spurgeon with duct tape and beat them with handguns. PSR ¶ 3. The defendant and his coconspirators asked, "Where's the money? Where's the 30 keys?" PSR ¶ 5. When this failed, they put a pillow over Spurgeon's head, cocked a gun, and said, "You're going to die for the money." PSR ¶ 6. Believing the police were on their way, the defendant and his coconspirators left the apartment shortly after this exchange. PSR ¶¶ 7-8. The defendant and his coconspirators stole cash and jewelry but did not find cocaine or substantial drug proceeds. PSR ¶ 8.

Winslow thereafter moved to her mother's and sisters' apartment, also in Brooklyn. PSR ¶ 10. On April 21, 1995, the defendant and two other individuals, armed, forced their way into Winslow's mother's apartment; Spurgeon's three-year-old child was in the apartment. PSR ¶ 11. The defendant and his coconspirators duct-taped Winslow's and her mother's eyes, bound their hands, and searched for money and drugs. PSR ¶ 11. Having failed to find drugs or drug proceeds, the defendant and a coconspirator raped Winslow. PSR ¶ 13. Afterwards, the defendant sodomized Winslow with a broomstick and thereafter left with money, jewelry, and mink coats. Id.

On February 5, 1996, while Winslow was using a pay phone in Brooklyn, the defendant and two other men approached her. PSR ¶ 18. The defendant lifted up his shirt to reveal a gun in his waistband and demanded her coat and jewelry. Id.

Beginning with the April 21, 1995 robbery and sexual assault, the defendant engaged in a pattern of witness tampering and harassment, despite the existence of orders of protection obtained by Winslow, Spurgeon and Winslow's mother. PSR ¶¶ 19, 20. The defendant's intimidation efforts included stalking Winslow at her home, school and work, and the February 5, 1996 robbery itself. PSR ¶ 20. After the February 5, 1996 robbery, the defendant increased his witness tampering efforts by, among other things: (i) repeatedly contacting Winslow; (ii) sending people to the Winslow house on his behalf; (iii) terrorizing Winslow's sister at her school; (iv) intimidating Winslow's mother into talking to his lawyer; and (v) forcing Winslow to recant her allegations to his parole officer. PSR ¶¶ 20, 21.

At trial, Winslow testified that she first met the defendant in January 1995 when the defendant engaged in a conversation with Spurgeon in front of her. (Tr. 75-78.) Winslow positively identified the defendant in court as the same individual and as one of the individuals who repeatedly robbed her at gunpoint. Id. For example, with regard to the April 21, 1995 robbery, Winslow testified that the defendant "pulled out a gun and told us to go inside, into the apartment." (Tr. 108.) Winslow testified that the defendant then made her, her mother and her three-year old daughter lie face down on the living room floor. (Tr. 111.) Winslow further testified that the defendant then separated her from her daughter and took her to a bedroom

where he raped her and then sodomized her with a broomstick. (Tr. 115-17.) Winslow testified that she then fell off the bed. (Tr. 115.) In response to a question of what she saw at that point, Winslow testified, "I remember looking and I saw a gun in [the defendant's] hand." (Tr. 118.) Winslow testified that the police were called that night, and while she told a detective that she "knew who did it" (Tr. 122), she did not name the defendant at the time (Tr. 247-48) and gave a fake name when she sought medical treatment the next day because she was "embarrassed" (Tr. 124).

Winslow further testified that on February 5, 1996, the defendant again robbed her at gunpoint, this time on the street in East New York. (Tr. 137-41.) On this occasion, the defendant directed Winslow not to cooperate with law enforcement and threatened her and her family if such contacts were made. (Tr. 141.) Winslow drove straight to the 75th Precinct and identified the defendant as among the perpetrators of all three robberies. (Tr. 143-46.) Winslow explained that she did not previously identify the defendant to the police because she was afraid of the defendant and that the police would not help her. (Tr. 146.) Winslow further testified that the defendant subsequently intimidated her into falsely recanting about the defendant's involvement in the robberies. (Tr. 171-84; 193-200.)

On cross-examination, Winslow was questioned about her failure to be forthcoming about her rape and to identify the defendant to law enforcement until after the February 5, 1996 robbery. (Tr. 246-47; 256-58.) Defense counsel also cross-examined Winslow about alleged omissions and lies to a Kings County grand jury—namely, that she was not forthcoming about Spurgeon's history as a drug trafficker and did not divulge that she had been raped. (Tr. 259-62.) Winslow concluded her testimony by stating that there was no doubt in her mind that the defendant was the individual who robbed her three times and who had raped and sodomized her.[1] (Tr. 293.)

On December 8, 1997, a jury convicted the defendant of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951 (Count One); narcotics trafficking conspiracy, in violation of 21 U.S.C. § 841(a)(1) (Count Two); conspiracy to commit witness intimidation, in violation of 18 U.S.C. § 1512(b) (Count Three); attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Seven); attempted possession of narcotics with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count Eight); and witness tampering, in violation of 18 U.S.C. § 1512(b) (Counts Nine and Eleven). ECF Nos. 3, 118. The jury acquitted the defendant of one substantive Hobbs Act robbery count (Count Four), one substantive narcotics distribution attempt count (Count Five), and two substantive firearms possession counts (Counts Six and Ten).

On February 5, 1998, the defendant moved for a judgment of acquittal. See ECF No. 122. For reasons unrelated to Winslow's identification of the defendant as the person who committed the crimes of conviction, Your Honor vacated the defendant's witness tampering and witness intimidation conspiracy convictions on Counts Three and Nine. See United States v. Johnson, 1998 WL 259920 (E.D.N.Y. May 20, 1998). The Court left undisturbed the

---

[1] At sentencing, Your Honor stated on numerous occasions that the Court "credit[ed]" Winslow's trial testimony. See July 16, 1998 Sent. Tr. at 14, 21.

defendant's convictions of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951 (Count One); narcotics trafficking conspiracy, in violation of 21 U.S.C. § 841(a)(1) (Count Two); attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Seven); attempted possession of narcotics with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count Eight); and witness tampering, in violation of 18 U.S.C. § 1512(b) (Count Eleven).

B.     Sentencing and Initial Appeal

On October 24, 1996, the date of the federal indictment, the government filed a prior felony information pursuant to 18 U.S.C. § 3559(c). See Information, ECF No. 7. The government identified three of the defendant's prior state convictions that constituted serious violent felonies under 18 U.S.C. § 3559(c) ("Section 3559(c)" or the "Three Strikes Statute"): (1) an August 8, 1983 conviction of Second Degree Robbery, in violation of New York Penal Law § 160.10, for which the defendant was sentenced to two to six years' imprisonment; (2) a September 12, 1983 conviction of First Degree Robbery, in violation of New York Penal Law § 160.15, for which the defendant was sentenced to two to six years' imprisonment; and (3) a February 10, 1988 conviction of Attempted First Degree Robbery, in violation of New York Penal Law §§ 160.15 and 110.00, for which he was sentenced to four to eight years' imprisonment. Id. The filing of the prior felony information and the defendant's instant convictions subjected him to a mandatory sentence of life imprisonment. See 18 U.S.C. § 3559(c).

This Court sentenced the defendant to concurrent terms of life imprisonment on the Hobbs Act robbery conspiracy and attempt (Counts One and Seven), witness tampering (Count Eleven), and narcotics charges (Counts Two and Eight). See Judgment, ECF No. 129. In imposing a sentence of life imprisonment as to Counts One and Seven, Your Honor stated:

> I find that, as Congress has found apparently as well, that mandatory life here is necessary for incapacitation. Mr. Johnson, you are a classic example of a person that has to be incapacitated so society is protected against you. You have a violent history. You've spent a lot of time in jail. And, when you've been out of jail, you have visited all sorts of harm to the community. And this new statute seems to be tailor-made to your situation . . . .

See July 16, 1998 Sent. Tr. at 43. Regarding the narcotics charges, the Court stated, "On Counts 2 and 8, I have the discretion to impose a sentence from 10 years to life. I choose to impose a life sentence." Id. at 40. And for the witness tampering charge, the Court stated, "I think that the fact that he's been charged with using intimidation and physical force brings it within the mandatory life provision, and I'll make that the standard of law here." Id. at 43.

The defendant appealed. See United States v. Johnson, 181 F.3d 83 (2d Cir. 1999). As relevant here, he attacked the constitutionality of the Three Strikes Statute insofar as it placed the burden on a criminal defendant to prove that his crimes do not qualify as "serious violent felonies." See id. at *3. The defendant also sought to recall Winslow to testify about the crimes for which the defendant had been convicted. See id. The Second Circuit rejected these arguments and affirmed his conviction. See id. at *3-4.

4

C.     First Habeas Petition

On May 31, 2000, the defendant filed a petition pursuant to 28 U.S.C. § 2255. See No. 00-cv-3142, ECF No. 1 (E.D.N.Y.). The defendant argued, inter alia, that Winslow testified falsely and that his trial counsel was ineffective for (a) refusing to allow him to testify and (b) insufficiently investigating Winslow's credibility. See Johnson v. United States, 2001 WL 1112028, at *1 (E.D.N.Y. Sept. 21, 2001). This Court found the petition to be "bereft of merit." Id. at *4. In particular, with regard to the defendant's argument that Winslow testified falsely, this Court found that "defense counsel vigorously cross-examined Winslow" and that the question of her credibility "was fully explored at trial." Id. Accordingly, this Court denied relief and declined to issue a certificate of appealability. Id. at *5. The defendant unsuccessfully appealed. See No. 00-cv-3142, ECF Nos. 13, 15.

D.     Dexter Isaac and the Government's 2012 Brady Disclosure

In 1999, Dexter Isaac was convicted, following a jury trial in the Eastern District of New York, of murder-for-hire conspiracy and murder-for-hire, both in violation of 18 U.S.C. § 1958; Hobbs Act robbery conspiracy and Hobbs Act robbery, both in violation of 18 U.S.C. § 1951; using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); witness tampering; and obstruction of an official proceeding. See No. 98-cr-497, ECF No. 182, at 2. The evidence at trial showed, among other things, that in approximately December 1997, Isaac was hired by his co-defendant, Micheline Hammouda, to rob and kill her husband. See id. Hammouda agreed to pay Isaac for the murder by transferring a house to Isaac and his girlfriend. Id. Isaac and a coconspirator thereafter committed the murder on December 30, 1997, by shooting the victim twice in the head outside of the victim's apartment building, killing him. Id. During the course of the murder-robbery, Isaac took the victim's briefcase, wallet and keys. One of the principal purposes of the murder-robbery was to steal from the victim's apartment tens of thousands of dollars in proceeds from the victim's work as a cab driver. Id.

On March 28, 2000, the Honorable Sterling Johnson, Jr., United States District Judge for the Eastern District of New York, sentenced Isaac to a term of life imprisonment plus a five-year consecutive term on the Section 924(c) offense. Id. The Second Circuit affirmed Isaac's conviction on August 1, 2001. Id. at 3. Therefore, since at least August 2001, Isaac has known that he would almost certainly spend the rest of his life in prison.

In late 2011, the government learned that Isaac and James Rosemond[2] may be in possession of information favorable to the defendant regarding his involvement in the robberies

---

[2]     James Rosemond ("Rosemond") was an entertainment industry executive. In 2012, he was convicted in the Eastern District of New York for leading a continuing criminal enterprise that distributed thousands of pounds of cocaine in Brooklyn and Queens. Rosemond was also convicted of narcotics conspiracy offenses, firearms possession, money laundering, structuring, and obstruction of justice. Then-United States District Judge John Gleeson sentenced Rosemond to life imprisonment. See No. 11-cr-424, ECF No. 244. In 2017, Rosemond was convicted in the Southern District of New York of murder-for-hire, conspiracy to commit murder-for-hire, and firearms offenses. The Honorable Lewis A. Kaplan, United States

of Winslow. Specifically, the government obtained information that Isaac had stated that he committed the robberies for which the defendant was convicted. On or about May 3, 2012, the government disclosed to the defendant's then-counsel that Isaac and Rosemond possessed information that might be favorable to the defendant in connection with his convictions. See ECF Nos. 144, 146. On June 25, 2012, Your Honor re-appointed said counsel as the defendant's attorney for the purpose of investigating the information provided by the government. See ECF No. 145.

    E.    Second and Successive Habeas Petition

        1.    The Second Circuit Filing

On June 24, 2016, the defendant filed a successive petition for relief under 28 U.S.C. § 2255. ECF No. 154. In this second petition, the defendant argued, "[t]he serious violent felony definition relied on by the Court contained within 18 U.S.C. § 3559(c)(2)(F)(ii) is materially indistinguishable from the Armed Career Criminal Act's residual clause which was invalidated by the Supreme Court's decision in Johnson v. United States, 135 S. Ct. 2551 (2015), and held retroactively applicable in Welch v. United States, 136 S. Ct. 1257 (2016)." Id. at 4. The Second Circuit stayed the defendant's motion, seeking additional documents concerning whether he was "entitled to relief under Johnson." ECF No. 158-1.

On June 23, 2020, the defendant filed an "Amended and Supplemented Successive Petition." See No. 16-2152, Dkt. No. 29 (2d Cir.) (the "Supplemental Petition" or "Supp. Pet."). First, the defendant claimed in the Supplemental Petition that there was compelling evidence of his innocence that the jury did not hear, citing the following:

- A February 5, 2020 podcast interview with Isaac, in which Isaac allegedly claimed that the defendant did not commit the robberies for which the defendant was convicted;

- A DEA report dated March 13, 2010,[3] which the defendant claims to have discovered in 2019, in which Isaac purportedly admitted to the government that he committed the robberies for which the defendant was convicted;

- Affidavits from four individuals, all of whom were incarcerated at the time, in which the affiants claim that Isaac admitted to the robberies for which the defendant was convicted:

    o    Affidavit of James A. Mitchell, dated May 7, 2000;

---

District Judge for the Southern District of New York, sentenced Rosemond to an additional life imprisonment term. See No. 10-cr-431, ECF No. 425.

    [3]    The defendant stated that the DEA report is dated March 7, 2012, but the document purports to have been prepared on March 13, 2010. See ECF No. 168-2.

6

- o   Affidavit of Ray A. Majors, dated June 27, 2000;

- o   Affidavit of Chad Flowers, dated May 21, 2002; and

- o   Affidavit of Abdul Rahim Howard, dated May 10, 2012;

- An October 10, 1996 transcript of a conference in Kings County Supreme Court which the defendant claims demonstrates that Winslow perjured herself before the grand jury in that court;

- A June 15, 2020 affidavit from Tamara Johnson, the defendant's sister, that the defendant claims contradicts Winslow's testimony and raises questions as to Winslow's credibility; and

- An April 3, 2003 affidavit of Frantz Michel in which he claimed that, in or about March 1995, Spurgeon told him that one of Winslow's friends staged the March 1995 robbery.

Id. at 4-6 (citing Exhibits A-J attached thereto). The defendant claimed that the above-referenced evidence established actual innocence and that the government violated his due process rights by allowing Winslow and Spurgeon to testify falsely.[4]  Id. at 6-7.

Second, the defendant argued that he received ineffective assistance of counsel. Id. at 8. This argument was based on counsel's failure to "discover[] Crystal Winslow's propensity for untruthfulness" and call Tamara Johnson as a witness. Id.

Third, the defendant argued that the residual clause of the Three Strikes Statute, under which he was sentenced to life imprisonment, was unconstitutionally vague. See id. at 11-12. Citing the Supreme Court's decisions in Johnson, Sessions v. Dimaya, 138 S. Ct. 1204 (2018), and United States v. Davis, 139 S. Ct. 2319 (2019), the defendant argued that the crimes for which he was convicted—conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, and witness tampering—are not categorically "serious violent felonies" under 18 U.S.C. § 3559(c)(2)(F)(ii). See Supp. Pet. at 12. Accordingly, the defendant claimed that the Court should vacate his life sentence. Id.

Fourth, the defendant argued that, even though he "was a violent criminal," the balance of his crimes happened when he under 25 years old, and "he is a changed man." Id. at 10, 11 (emphasis in original).

2.   The Second Circuit Mandate

On September 9, 2020, the Second Circuit lifted its stay and granted the defendant's motion for leave to file a successive § 2255 petition. See ECF No. 164. The court stated, "Petitioner has made a prima facie showing that the proposed § 2255 motion satisfies the

---

[4]   The defendant also argued that he was "subjected to spillover prejudice" and that if the Court were to determine that he was wrongfully convicted of any of the counts, all counts of conviction should be vacated. Id. at 9.

7

requirements of § 2255(h) with regard to his claim under Johnson, Dimaya and Davis." Id. at 1; see also id. (noting that this "is not a particularly high standard" (quoting Bell v. United States, 296 F.3d 127, 128 (2d Cir. 2002)). The Second Circuit was also clear that it "ha[d] not examined any other arguments or claims raised by Petitioner, including his claim based on newly discovered evidence." ECF No. 164 at 2. It also noted that it did "not consider[] the Government's harmless error argument, which it may present to the district court." Id. Accordingly, it left for this Court to decide whether the defendant's claims satisfy the requirements governing successive § 2255 motions. Id.

### 3.   The Defendant's Successive Petition to This Court

On November 6, 2020, the defendant filed a memorandum in support of his successive § 2255 petition. See generally ECF No. 168. The arguments in the memorandum largely tracked those in the Supplemental Petition, and the defendant reattached the same set of exhibits. See id. On July 24, 2023, the Court denied the defendant's second and successive habeas petition. See ECF No. 182. First, as to the defendant's ineffective of assistance claims, the Court held that the defendant's claims were not timely, and even if they were timely, they nonetheless failed on the merits because his counsel's decisions "were tactical ones not rising to the level of unreasonableness required by Strickland" nor can the defendant "prove prejudice resulting from these decisions." Id. at 4-5.

Second, regarding the defendant's actual innocence claims, the Court held those to be untimely as well, and even if they were timely, the defendant also faced a procedural bar because "[f]reestanding claims of actual innocence, such as Johnson's, are generally not cognizable under § 2255, since they do not alone present a constitutional violation." Id. at 6. Notwithstanding, and giving the defendant a full airing of his claims, the Court assessed the merits of the defendant's actual innocence claims, "assuming arguendo that they are cognizable," and held that "they do not reach the extraordinarily high bar required." The Court rightly observed that "[a]ll of the evidence of Isaac being the true perpetrator of Johnson's crimes are based on Isaac's own statements to others and to the media," and that Isaac, who is already serving a life sentence for his own federal convictions, including murder-for-hire, witness tampering, and Hobbs Act robbery, "has nothing to lose by claiming credit for these crimes, particularly since he did so only after determining that the statute of limitations had run." Id. at 7. The Court assessed that Isaac was not credible, that the affidavits he submitted were not credible, that the DEA report appeared fraudulent, and that the defendant's arguments regarding Winslow and Spurgeon were similarly unpersuasive or not credible.

Third, as to the defendant's attacks based on Supreme Court rulings regarding the residual clause of different statutes, the Court held that the defendant's sentence need not be disturbed because his convictions for attempt and conspiracy to commit Hobbs Act robbery are squarely covered by the enumerated offenses clause of 18 U.S.C. § 3559(c)(2)(F)(i).

Finally, although acknowledging the defendant's many certificates and good behavior while incarcerated, the Court held that "even with such exemplary behavior while incarcerated, rehabilitation is not a cognizable basis for relief under § 2255," nor is the defendant's age at the time of the offense conduct. Id. at 12-13. The Court observed that these

factors "may be considered along with other factors on a motion for compassionate release under 18 U.S.C. § 3582(c)." Id. at 13.

    F.    <u>The Instant Motion for Compassionate Release</u>

On December 1, 2023, the defendant filed a motion to reduce his sentence under 18 U.S.C § 3582(c)(1)(A). See ECF No. 188. Subsequently, the defendant successfully sought assistance from the Federal Defenders of New York, who moved the Court to be appointed counsel to assist the defendant with his motion. On March 8, 2024, defendant filed his counseled motion for compassionate release. See ECF No. 194. In his motion, the defendant argues that there are "extraordinary and compelling reasons" warranting a reduction in his sentence, namely (i) the rarity of sentences under the Three Strikes Statute, (ii) the length of the defendant's sentence; (iii) the defendant's rehabilitation, including his disciplinary record and remorse; (iv) his and his mother's health; and (v) his community of support.

II.    <u>Relevant Law</u>

"A compassionate release motion is a request for a permanent reduction in a defendant's federal sentence. Generally, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); see <u>Dillon v. United States</u>, 560 U.S. 817, 824-25 (2010). Compassionate release is one of the few exceptions to this rule, allowing a court to "reduce the term of imprisonment (and . . . impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)." 18 U.S.C. § 3582(c)(1). The First Step Act, which modified 18 U.S.C. § 3582(c), provided that "upon motion of the defendant," and "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons [("BOP")] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," the Court may reduce such defendant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). The defendant bears the burden of proving he is entitled to compassionate release. See <u>United States v. Butler</u>, 970 F.2d 1017, 1026 (2d Cir. 1992).

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") and BOP policy have provided criteria to aid the courts' determination of when compassionate release is appropriate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13. Specifically, the Guidelines have specified the following circumstances or combination of circumstances: (i) medical circumstances of the defendant, (ii) age of the defendant, (iii) family circumstances of the defendant, (iv) victim of abuse, (v) other reasons that are similar in gravity, and (vi) an unusually long sentence. U.S.S.G. § 1B1.13(b). Importantly, the Guidelines specify that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement," and that "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d).

A court's consideration of a compassionate release motion is not limited to only whether there are extraordinary and compelling reasons; rather, a court also assesses whether

"the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)" and whether "the reduction is consistent with [the Guidelines] policy statement." U.S.S.G. § 1B1.13(a). Section 3142(g) advises courts, in making an assessment regarding whether a defendant is a danger to the safety or any other person or to the community to take into account the available information concerning: (i) the nature and circumstances of the offense, including whether the offense is a crime of violence or involves, among other things, a controlled substance or firearm; (ii) the weight of the evidence against the person; (iii) the history and characteristics of the person; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Even if a court determines that extraordinary and compelling reasons exist, the court's inquiry does not stop there. A court must "consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances." United States v. Davies, No. 17 CR 57, 2020 WL 2307650, at *2 (E.D.N.Y. May 8, 2020) (citation omitted); see also United States v. Reid, No. 05 CR 5596, 2021 WL 837321, at *4 (E.D.N.Y. Mar. 5, 2021) ("Even if extraordinary and compelling reasons exist, they must outweigh the [Section] 3553(a) factors to warrant sentence reduction.") (citing 18 U.S.C. § 3582(c)(1)(A)). In other words, the existence of extraordinary and compelling reasons does not per se compel compassionate release if the court determines that the Section 3553(a) factors warrant continued imprisonment. See United States v. Gotti, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020) ("[A] defendant who meets all the criteria for compassionate release consideration . . . is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors . . . ."); see also United States v. Roney, 833 F. App'x 850, 853 (2d Cir. 2020) (explaining that, even if the defendant presented extraordinary and compelling reasons for release, his motion could be denied based solely on a consideration of the Section 3553(a) factors).

Pursuant to Section 3553(a), the Court must consider whether, when weighed against the purported "extraordinary and compelling reasons," the following factors, among others, permit release: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to (a) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense; (b) afford adequate deterrence to criminal conduct; and (c) protect the public from further crimes of the defendant; and (iii) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. See 18 U.S.C. § 3553(a)(1), (2), and (6). A district court may deny a motion for compassionate release based solely on the Section 3553(a) factors without reaching the question of whether extraordinary and compelling reasons are present. See United States v. Keitt, 21 F.4th 67, 69 (2d Cir. 2021).

III. <u>Argument</u>

        This Court should deny the defendant's motion for compassionate release because the defendant has not shown "extraordinary and compelling" circumstances justifying the extraordinary remedy he seeks. And even if he could make that required showing, the Court should deny his application given the extremely serious nature of his offense and the need to ensure adequate punishment, deterrence and protection of the community.

    A. <u>The Defendant Has Not Demonstrated Extraordinary and Compelling Reasons Warranting a Sentence Reduction</u>

        1. <u>The Defendant's Sentence Is Not Unusually or Excessively Long</u>

        The defendant's sentence of life imprisonment is not unusually or excessively long, nor was it inappropriately handed down given the heinousness of the defendant's crimes here, the number of crimes he committed here, and the defendant's prior criminal history. More importantly, that the defendant was sentenced to life is not, in and of itself, an extraordinary and compelling reason for a sentencing reduction, and the Court should reject the defendant's argument on this score.

        Setting aside that a long sentence is not itself an extraordinary and compelling reason, defendant's attempt to make it a compelling reason fails on substance, as well. In the first instance, the defendant's argument focuses on robbery convictions only: statistics about courts imposing sentences of lifetime imprisonment for robbery crimes, the purported uniqueness of the defendant's sentence for robbery within the Second Circuit,[5] and the average sentences for robbery cases. The defendant's argument does not meaningfully discuss the fact that the defendant was sentenced to <u>five</u> concurrent life sentences, and only <u>two</u> of those sentences relate to the Hobbs Act robbery attempt and conspiracy (Counts One and Seven). The three other life sentences were for the defendant's convictions for witness tampering (Count Eleven), narcotics trafficking conspiracy, (Count Two), and attempted possession of narcotics with intent to distribute (Count Eight), against which the defendant has presented no argument that these sentences are unusually long or excessive, except to say that had the government not decided to file a prior felony information, the defendant would have faced ten-year mandatory minimum sentences on the narcotics convictions and that the robbery and witness intimidation convictions carried no mandatory minimum prison sentences. <u>See</u> ECF No. 194 at 11. But the defendant's conduct is not siloed,[6] and the Court exercised appropriate discretion in sentencing the defendant for his collective conduct to five concurrent life sentences.

---

     [5]     The government does not concede that these Second Circuit figures are accurate, as there has been no explanation regarding how and by what parameters those cases were identified.

     [6]     In fact, the defendant's PSR calculated his grouped total offense level to be 38 and his criminal history category to be VI, which, at the time of sentencing, would have yielded a 360 years-to-life Guidelines range. <u>See</u> PSR ¶¶ 78, 89.

11

Indeed, in imposing a sentence of life imprisonment as to the robbery charges, the Court described the need to incapacitate the defendant: "Mr. Johnson, you are a classic example of a person that has to be incapacitated so society is protected against you. . . . And this new statute seems to be tailor-made to your situation . . . ." See July 16, 1998 Sent. Tr. at 43. Regarding the narcotics charges, the Court stated, "On Counts 2 and 8, I have the discretion to impose a sentence from 10 years to life. I choose to impose a life sentence." Id. at 40. And for the witness tampering charge, the Court stated, "I think that the fact that he's been charged with using intimidation and physical force brings it within the mandatory life provision, and I'll make that the standard of law here." Id. at 43.

Moreover, contrary to the defendant's argument that "it is difficult to imagine this Court, or any Judge in this District, imposing a [lifetime imprisonment] sentence in this case, on these facts," life sentences are handed down, affirmed, and maintained in the face of post-conviction applications when the facts warrant them. Here, the facts warrant the defendant's life sentences. His attempt to recast his violent, brutal conduct as mere robbery convictions not warranting a lifetime sentence is belied by what the defendant did: He targeted Winslow and Spurgeon, forcing his way with his confederates into their home at gunpoint, binding Winslow and Spurgeon with duct tape, beating them with handguns—torturing them to try to take from them money and drugs. When Winslow moved into her mother's and sisters' apartment, the defendant again targeted Winslow, forcing his way with his coconspirators into her mother's apartment at gunpoint, binding Winslow and her mother, duct taping their eyes, brutally gang raping Winslow, and even sodomizing her with a broomstick with Winslow's mother and three-year-old child also in the apartment. As to witness intimidation, the defendant's intimidation efforts included stalking Winslow at her home, school and work, and the February 5, 1996 robbery itself. PSR ¶ 20. After the February 5, 1996 robbery, the defendant increased his witness tampering efforts by, among other things: (i) repeatedly contacting Winslow; (ii) sending people to the Winslow house on his behalf; (iii) terrorizing Winslow's sister at her school; (iv) intimidating Winslow's mother into talking to his lawyer; and (v) forcing Winslow to recant her allegations to his parole officer. PSR ¶¶ 20, 21.

The defendant's conduct, when taken as a whole, does not render his sentence an outlier, nor is his sentence excessively or unusually long for a defendant who consigned a victim to a living hell, by, among other things, raping and sodomizing her while she was bound and blinded in the course of a gunpoint robbery, intimidating the victim, stalking her, stalking her family, and engaging in narcotics trafficking conspiracy and narcotics possession with intent to distribute.

      2.    The Defendant's Rehabilitation Is Not Alone a Sufficient Basis for Compassionate Release

The defendant next argues that his rehabilitation and prison record would warrant compassionate release. While the defendant's participation in classes and training programs are worth noting, multiple courts in this district have recognized that "post-conviction conduct alone also cannot form the basis of [a] motion for compassionate release." United States v. Antney, No. 17-CR-229 (CBA), 2021 WL 4502478, at *6 (E.D.N.Y. Sept. 30, 2021). This is because Congress has made clear that "rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for a reduced sentence under 18 U.S.C. § 3582(c)(1)(A).

28 U.S.C. § 994(t); see also United States v. Campbell, No. 20-42-4, 2022 WL 199954, at *1 (2d Cir. Jan. 24, 2022).  After all, rehabilitation and "model prison conduct is expected" of federal inmates.  United States v. Veliu, No. 17-CR-404 (KAM), 2022 WL 2484240, at *5 (E.D.N.Y. July 56, 2022) (citing United States v. Garcia, No. 19-CR-210 (CS), 2022 WL 672758, at *2 (S.D.N.Y. Mar. 7, 2022)); United States v. Mack, No. 12-CR-111-2 (CS), 2022 WL 902958, at *2 (S.D.N.Y. Mar. 28, 2022) (declining to find rehabilitation efforts warranted release because "[m]aking good use of one's time in prison is not uncommon, and indeed is expected").

       The Second Circuit has repeatedly affirmed denials of compassionate release where defendants cited extensive rehabilitative efforts.  See, e.g., United States v. Robinson, No. 21-CR-1865, 2022 WL 2204126, at *3 (2d Cir. June 21, 2022) (summary order) (district court did not abuse discretion when it found that the defendant's "rehabilitation . . . was insufficient to justify relief"); United States v. Garcia, No. 21-CR-1181, 2022 WL 2154675, at *2 (2d Cir. June 15, 2022) (summary order) (affirming denial of compassionate release where district court acknowledged rehabilitative efforts of defendant but concluded that defendant's criminal history and seriousness of his crime did not warrant release); United States v. Reyes, No. 20-3285, 2022 WL 1669388, at *1 (2d Cir. May 26, 2022) (summary order) (affirming compassionate release denial where district court "acknowledged [the defendant's] efforts toward rehabilitation, [but] nevertheless found that the section 3553(a) factors weighed heavily against a sentence reduction" based on the defendant's conduct).

       This is consistent with the Guidelines, which provide that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason" for compassionate release.  U.S.S.G. § 1B1.13(d).  And although the Court may consider rehabilitation in combination with other factors, id., that avenue is not available here because, as discussed above and below, the other purported bases for a finding of "extraordinary and compelling" reasons are wholly insufficient.  See Brooker, 976 F.3d at 237-38 ("The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'") (quoting 28 U.S.C. § 994(t)).

       3.     <u>The Defendant's Attacks on His Sentence and Claims of Actual Innocence Negate His Claims of Remorse and in Any Event Remorse Is Not an Extraordinary and Compelling Reason for Release</u>

       The defendant also presents claims of remorse together with his arguments on rehabilitation.  See ECF No. 194 at 14-17.  But these claims of remorse and introspection are wholly undermined by his relentless refusal, for approximately a quarter century, to accept responsibility for his actions—through at least 2021.  This includes his baseless assertions that he was wrongly convicted, that he was actually innocent, and that the Court should discredit the testimony of the young woman that he, with others, threatened with firearms; beat; raped; sodomized; terrorized; and intimidated.  Put simply, the defendant's purported remorse nearly 30 years after such offense conduct is not extraordinary and compelling.  And even if the defendant's remorse were genuine—and the government does not believe that it is given his history through at least 2021—various courts have held that remorse is simply not an extraordinary and compelling reason for release.  See, e.g., United States v. Herrera, No. 21-CR-750 (LJL), 2023 WL 3862695, at *3 (S.D.N.Y. June 7, 2023) ("Mr. Herrera argues that he did

13

everything he could to accept responsibility and to express remorse for his actions. . . . The Court credits that statement. . . . At the same time, however, as the Court emphasized at the time of sentencing, the interests of just punishment and promotion of respect for the law, as well as those of general deterrence, compelled a lengthy sentence."); United States v. Ramirez, No. 98-CR-438 (PGG) (SDA), 2021 WL 4150891, at *7 (S.D.N.Y. Sept. 13, 2021) (finding that even "some evidence of rehabilitation and acceptance of responsibility," including a letter "appear[ing] to express genuine remorse," are "not so extraordinary as to warrant relief").

In short, the defendant's purported remorse is nearly 30 years belated. Such as it is, it comes only after he has exhausted all of his other attempts to challenge his conviction and sentence. Indeed, this purported remorse appears only after his failure to prevail following years of post-conviction attacks against the victim whose life he made a living hell by his vicious conduct before trial.

### 4. The Defendant's Health Is Not an Extraordinary and Compelling Reason Justifying a Sentence Reduction

The defendant cites a series of medical conditions "that come with age: hypertension, hyperlipidemia, obesity, and sleep apnea, in addition to a heart condition," which he argues, when coupled with generalized arguments about medical care at BOP facilities, establish extraordinary and compelling reasons for sentence reduction. See ECF No. 194 at 18. None of these conditions meet the scenarios the Guidelines have outlined when describing what could amount to an extraordinary and compelling medical circumstance faced by the defendant.

In describing what would be extraordinary and compelling, the Guidelines cites circumstances where (i) the defendant is suffering from a terminal illness, like metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia, (ii) the defendant is suffering from either (a) a serious physical or medical condition, (b) a serious functional or cognitive impairment, or (c) deteriorating physical or mental health because of the aging process, and that such condition is substantially diminishing his ability to provide self-care in prison and from which he is not expected to recover; (iii) the defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death; or (iv) there is an ongoing outbreak of infectious disease or an ongoing public health emergency declared by the appropriate federal, state, or local authority and the defendant has specific characteristics that particularly endanger him. See U.S.S.G. § 1B1.13(b)(1).

The defendant makes no such assertions here, and he is not terminally ill. Moreover, by the defendant's own admission, he is receiving care for his conditions, noting the results of his most recent annual chronic care appointment and itemizing the medicine he has been prescribed. See ECF No. 194 at 18 ("At his most recent annual chronic care appointment, his doctor began him on rosuvastatin to treat his high cholesterol, in addition to the already-prescribed aspirin, amlodipine, chlorthalidone, and lisinopril that treat his chronic conditions."). Thus, the concerns raised in the defendant's submission appear to be managed and cannot constitute extraordinary and compelling reasons warranting his release.

Courts apply an exacting standard when assessing whether a defendant's health conditions are extraordinary and compelling and will only grant "sentence modifications or reductions based on defendants' medical conditions where those conditions are extremely serious, if not-life threatening." United States v. Fragoso, No. 18-CR-179 (JMA), 2021 WL 5205633, at *3 (E.D.N.Y. Nov. 9, 2021) (quoting United States v. Gileno, 448 F. Supp. 3d 183, 187 (D. Conn. 2020)). Based on this caselaw, courts routinely deny motions for compassionate release brought by defendants who are experiencing the same medical conditions as the defendant here, finding that these conditions are not extraordinary and compelling. See, e.g., United States v. Jaramillo, 858 F. App'x 418, 419 (2d Cir. 2021) (summary order) (affirming denial of compassionate release where defendant asserted diagnoses of "sleep apnea and breathing conditions, sleeping disorders, other specified symptoms and signs involving the circulatory and respiratory systems, prediabetes, anxiety disorders, and hypertension") (internal quotation marks omitted); United States v. Blair, 2023 WL 3973883, at *2 (S.D.N.Y June 13, 2023) (denying compassionate release where defendant alleged that he suffered from, among other things, obesity and hypertension); United States v. Taboada, 2023 WL 1468533, at *1 (S.D.N.Y. Feb. 2, 2023) (denying compassionate release where defendant suffered from glaucoma, as well as high blood pressure and obesity, among other things); Fragoso, 2021 WL 5205633 (denying compassionate release where the defendant underwent spinal cord neck surgery and shoulder surgery in December 2020, hypertension, high blood pressure, cholesterol, elevated triglycerides, and anxiety); United States v. McCullum, 2021 WL 1550322, at *2 (S.D.N.Y. Apr. 20, 2021) (denying compassionate release where defendant suffered from, among other things, COPD, obesity, and bronchitis). The defendant has not established how the severity of his conditions are distinguishable from those rejected by other courts or why such conditions warrant compassionate release as extraordinary and compelling.

Finally, that the defendant is receiving annual checkups and is being treated for his conditions further undercut the defendant's generalized arguments that the defendant may face issues later on because of possible "staffing shortages, funding issues, security issues, and administrative failures." See ECF No. 194 at 18. Such speculation is not an extraordinary and compelling reason warranting his release.

> 5. The Defendant's Mother's Health Is Not an Extraordinary and Compelling Reason Justifying a Sentence Reduction

The defendant also identifies his mother's failing health as a basis for relief, but his mother's health is not an extraordinary or compelling reason either. Section § 1B1.13(b)(3) of the Guidelines provides four examples of extraordinary and compelling reasons based on family circumstances, only one of which involves a defendant's parent: "The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent." Here, that does not appear to be the case. The defendant's mother is 86 years old and has been, according to his papers, battling cancer for 20 years, and there is no suggestion that his mother is now incapacitated or that the defendant is the only available caregiver.

While the government does not intend to minimize family circumstances, the defendant has not shown sufficient evidence to substantiate his claims warranting the extraordinary measure of releasing a dangerous felon early from prison. See United States v. Gonzalez, 16-CR-826-LTS, 2023 WL 6930758, at *4 (S.D.N.Y. Oct. 19, 2023) ("[W]hen a

15

defendant argues that his family circumstances warrant a sentence reduction, courts generally require a showing of evidence from several sources indicating that the defendant is the only available caregiver for a family member in dire conditions, before concluding that an extraordinary and compelling reason has been established." (emphasis added)).  A defendant must clear a "high bar of proving that an extraordinary and compelling reason warranting compassionate release" exists arising from the need to care for an incapacitated parent.  United States v. Yoda, No. 15-CR-95 (AJN), 2020 WL 5502325, at *2-3 (S.D.N.Y. Sept. 11, 2020).  The defendant has not done that here.  See, e.g., United States v. Romano, No. 22-CR-12 (KAM), 2023 WL 8735203, at *3 (E.D.N.Y. Dec. 19, 2023) (defendant "has not met his burden to show that he is the only available caregiver for his father"); see also United States v. Ingram, 2019 WL 3162305 (S.D. Ohio July 16, 2019) ("[F]amily circumstances that constitute 'extraordinary and compelling reasons' simply do not include [the defendant's] mother.  Many, if not all inmates, have aging and sick parents.")).

      6.      The Defendant's Support System Is Not an Extraordinary and Compelling Reason Justifying a Sentence Reduction

Finally, the defendant cites a "supportive network of family and loved ones in place who are committed to ensuring his successful reentry" and various character references in support of his contention that he has demonstrated extraordinary and compelling circumstances warranting release.  See ECF No. 194 at 19.  Similar to the arguments the defendant has advanced to suggest that he has been rehabilitated, the defendant's arguments based on statements by third parties attesting to the defendant's good character are undermined by the severity of the offense conduct.  See, e.g., United States v. Vaughn, No. 21-CR-1984, 2022 WL 2203857, at *1 (2d Cir. June 21, 2022) (affirming denial of compassionate release where district court considered defendant's good behavior while incarcerated and the support he would receive from family upon release, but "nonetheless reasonably concluded that reducing [the defendant's sentence by more than six years was unwarranted"); United States v. Stinson, No. 20-CR-3744, 2021 WL 5499478, at *1 (2d Cir. Nov. 24, 2021) (affirming denial of compassionate release despite the district court noting the defendant's rehabilitation and "positive contributions . . . to try to mentor other individuals and specifically young people to get their lives on track once they get out" due to the "seriousness of his offense and the necessity of specific and general deterrence").

      B.      Any Extraordinary and Compelling Reason Is Outweighed by the Section 3553(a) Factors

Even if the defendant had presented extraordinary and compelling reasons justifying a sentence reduction—which he has not done—the Court must still consider the factors contained in 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3582(c)(1)(A); see also United States v. Jones, 17 F.4th 371, 374 (2d Cir. 2021) ("[E]xtraordinary and compelling reasons are necessary—but not sufficient—for a defendant to obtain relief under § 3582(c)(1)(A).").  The Section 3553(a) factors may serve as "an alternative and independent basis for denial of compassionate release."  Jones, 17 F.4th at 374 (quoting United States v. Robinson, 848 Fed. Appx. 477, 478 (2d Cir. 2021) (summary order)).

In pertinent part, Section 3553(a) requires the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant . . . [and] the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(1), (2)(A).  The Court must also consider the need to "protect the public from further crimes of the defendant."  Id. § 3553(a)(2)(C).

As described above and in the government's prior opposition letters, the nature and circumstances of the defendant's conduct was unspeakably violent and malicious, and it makes clear that the defendant's release is unwarranted.  The defendant was a willing and active participant in the offense conduct and, until only recently, refused to accept any responsibility for his active participation in these crimes.  The defendant was not an unwitting coconspirator or someone who ordered others to act on his behalf only; to the contrary, the defendant affirmatively sought to and did terrorize a young woman, at times exhibiting breathtaking brutality even worse than his coconspirators: While he and a coconspirator both gang raped Winslow, it was the defendant alone that then sodomized her with a broomstick, with both acts being done in a bedroom while her mother and young child were also in the apartment.

And yet that was not the end of the defendant's specific maliciousness towards Winslow, as the defendant specifically showed her a gun in his waistband when he next robbed her.  The defendant also engaged in a pattern of witness tampering and harassment, despite the existence of orders of protection obtained by Winslow, Spurgeon and Winslow's mother by, among other things, stalking Winslow at her home, school and work; repeatedly contacting Winslow; sending people to the Winslow house on his behalf; stalking Winslow's sister at her school; intimidating Winslow's mother into talking to his lawyer; and forcing Winslow to recant her allegations to his parole officer.

Extraordinarily, for decades following the assault, torture, rape, threats, and intimidation he inflicted on the victim, the defendant continued to attack his victim's credibility in court in fruitless attempts to undo his conviction and sentence.  Given the defendant's conduct, including his history of continuing to attack the very woman he sexually violated, robbed, and intimidated, the purposes of sentencing—including punishment, deterrence, rehabilitation and protection of the public—would be undermined by the defendant's release from prison.  See United States v. Polanco, No. 07-CR-780 (FB), 2021 WL 1854739, at *1 (E.D.N.Y. May 10, 2021) (denying an application for compassionate release given the especially violent nature of the defendant's crimes); United States v. Cato, No. 16-CR-326 (ARR), 2020 WL 5709177, at *5 (E.D.N.Y. Sept. 24, 2020) (rejecting a request for compassionate release given the defendant's "history of crime and violence").

In summary, despite the defendant's arguments, the Section 3553(a) factors militate against any reduction to the defendant's sentence.  See United States v. Tranese, No. 17-CR-559 (CBA), 2021 WL 25371, at *2 (E.D.N.Y. Jan. 4, 2021) (holding that a reduction of defendant's sentence would "fail to achieve the important policies of the § 3553(a) factors—namely, providing just punishment, affording adequate deterrence, and promoting respect for the law").

IV.    Conclusion

        For the foregoing reasons, this Court should deny the defendant's motion for compassionate release.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ Amanda Shami
      Amanda Shami
      Assistant U.S. Attorney
      (718) 254-7528

cc:    Clerk of Court (FB) (via ECF)
      Mia Eisner-Grynberg, Esq. (via ECF)